**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MAX YVES MERLAIN,** | **Civil Action No. 20-3872 (MCA)** |
| **Petitioner,** | |
| **v.** | |
| | **OPINION** |
| **JAMES SLAUGHTER, et al.,** | |
| **Respondents.** | |

This matter has been opened to the Court by Max Ives Merlain's ("petitioner" or "defendant") filing of a habeas petition pursuant to 28 U.S.C. § 2254.  Having reviewed the Petition, Respondent's answer, and the record in this matter, the Court denies the Petition for the reasons stated in this Opinion and also denies a certificate of appealability ("COA").

## I.   FACTUAL BACKGROUND & PROCEDURAL HISTORY

A jury convicted petitioner of murdering his girlfriend's young son, and the Appellate Division summarized the trial evidence and procedural history as follows:

> A jury found defendant Max Yves Merlain, a/k/a Max Merlain, guilty of serious bodily injury murder, N.J.S.A. 2C:11–3a(1), and endangering the welfare of the two-year-old son of his girlfriend. Judge Heimlich imposed a forty-five year term of imprisonment subject to a No Early Release Act (NERA)[1] parole ineligibility term on the murder charge and a concurrent term of eight years subject to a four-year parole ineligibility term on the endangering charge.

---

[1] "N.J.S.A. 2C:43–7.2." *State v. Merlain*, No. 06–05–0421, 2012 WL 986998, at *1 (N.J. Super. App. Div. Mar. 26, 2012).

On August 8, 2004, at 7:41 p.m., Dominique, defendant's girlfriend, called 9–1–1 to report that her two-year-old son John[2] had vomited, stopped breathing, and had no pulse. When the first ambulance arrived, defendant was outside and flagged down the emergency response team. The crew found the child limp and unresponsive to all stimuli. He had no pulse, no respiration, and no blood pressure. He was cyanotic, pale and dry, and his extremities were cool to the touch.

John had bruising on the left side of his face, bilaterally on his upper front abdomen, on his lower right abdomen, and on the upper left side of his back. He appeared to have suffered a traumatic injury. His mother told the emergency responder that her son had fallen in the bathtub the day before, and had not exhibited any mental changes after the fall.

Emergency personnel placed the child in the ambulance and began cardiopulmonary resuscitation (CPR). Paramedics intubated him and provided medications. However, his heart showed no electrical activity, and his condition did not improve. The ambulance departed for Trinitas Hospital at 8:13 p.m., and it arrived at 8:23 p.m. CPR was performed and medications administered, to no avail. At 8:36 p.m., John was pronounced dead. He was 35½ inches tall and weighed between 25 and 35 pounds.

When medical personnel declared the child dead, his temperature was 97.3. The child was in rigor mortis in the extremities, and medical personnel noted lividity in his lower extremities, suggesting he had been dead for some time.

Medical personnel at the hospital noted an abrasion on John's face and bruising on the left side of his face, abdomen, and back. His belly was distended, indicating possible trauma. They recorded the mother's explanation for the bruising—the previous day's fall in the bathtub-but noted that the bruising was extensive and appeared to be less than twenty-four hours old.

Defendant traveled to the hospital in the paramedic vehicle. He was crying. Defendant stated that John had been sick for a couple of days, was vomiting, and he remarked he may not have administered CPR correctly.

The emergency room nurse also noted defendant's statements that he had cared for the child all day while the child's mother worked, that the child had slept all day, vomited, and defendant attempted to give the child juice because he kept

---

[2] The Court has replaced the victim's name with a pseudonym in the Appellate Division's opinions, other cited portions of the record, and throughout this opinion.

wanting something to drink. The nurse, as well as the emergency room doctor, acknowledged that the facial bruising combined with vomiting and sleepiness the following day could be a sign of a brain injury. However, the emergency room doctor found it significant that treatment was not sought sooner and considered the delay suggestive of non-accidental trauma.

When informed of John's death, his mother screamed and began to weep. Defendant also was upset. Doctor Keyon Hood questioned the two about John's history, and his mother related that he had fallen in the tub the night before, hitting the left side of his face. She reported that he suffered no loss of consciousness or vomiting that night, and he went to bed without further symptoms other than bruising or swelling on the left side of his face. On the day of his death, she left her son in defendant's care from 5:45 a.m. until sometime after 3 p.m., while she went to work.

Defendant said he awoke in the morning to find the child covered in vomit. Defendant changed him and the two went back to sleep. When John awoke again, he vomited and continually asked for juice. He vomited again around 7:30 p.m. and fell to the floor, at which time EMS was called.

Defendant and the child's mother related essentially the same version of events to Elizabeth police detectives Robert Hilongos and Steven Owsiany, who had responded to the hospital upon the report of John's death. After speaking with the child's mother and defendant, the officers observed the child's body, noting the bruises.

The following day, August 9, 2004, an autopsy was performed. The medical examiner, Dr. Leonard Zaretski, found that the manner of death was homicide by blunt force trauma to the head and abdomen. He found extensive injury to the left side of the child's face, including multiple overlapping irregularly-shaped lesions or spots of various sizes which indicated previous traumas and could not have occurred from the history provided by the child's mother and defendant. The child had contusions of fairly recent origin in the front of his right ear and on the right side of the back of his neck. The child also had a contusion under his left eyelid and another on his upper lip.

The medical examiner also found bruising on the left side of the belly and the forearm. The child had extensive blood accumulation inside his head, causing significant swelling of the brain and a subdural hematoma. The medical examiner also reported deep lacerations in two areas of the spleen and lacerations to the left kidney. The subdural hematoma, the lacerated spleen, or the lacerated kidney could have caused John's death.

Later in the day on August 9, 2004, the child's mother and defendant gave statements to the police at police headquarters. Her statement included essentially the same information as relayed at the hospital, except she estimated that John had fallen in the bathtub at 6:00 p.m. on August 7, the day before his death.

In his statement, defendant denied causing any harm to the child. He told the police that he had picked up John and his mother in Irvington at approximately 8:00 p.m. on Saturday August 7. He observed a bruise on John's face, which his mother explained by stating that John had fallen out of the bathtub. They arrived at defendant's apartment at approximately 9:00 p.m. That night, John's mother and defendant slept in defendant's bed; John slept on a sponge mattress on the living room floor. According to defendant, John fell asleep soon after they arrived at his apartment.

Between 11:00 and 11:35 p.m., defendant was out of the apartment, picking up his sister from work and driving her home. When he returned home, the child's mother was asleep, and defendant went to sleep too.

Defendant also reported that the child's mother awoke at about 5:00 a.m., and defendant walked her to the bus stop. John was asleep when they left the apartment, and he was still asleep when defendant returned a few minutes later.

In his statement, defendant stated he returned to bed and awoke up at 8:00 a.m. He checked on John, who was awake on the mattress, covered in vomit. Defendant picked up the child, changed his diaper and clothing, cleaned him up, changed the sheet on the mattress, laid down with him, gave him a bottle, turned on the television, and went back to his bed to sleep. When defendant awoke between 11:45 a.m. and noon, John was awake. Defendant attempted to feed him, but the child rejected the food. The two then fell asleep on defendant's bed, with John drinking chocolate milk from a bottle.

When John's mother arrived home after work, John called for her, and defendant gave him another bottle of chocolate milk. According to defendant, while John played with his mother, the child drank about three bottles of milk and half a bottle of fruit punch. He then made a noise like he was choking and vomited on the bed. Defendant rushed him to the bathroom and held him over the sink. When defendant turned him over, he observed John's "eyes roll to the back of his head." The child was not breathing, so defendant started CPR and told John's mother to call 9–1–1. When EMS arrived, they continued to perform CPR and rushed John to the hospital, where he was pronounced dead.

On August 11, 2004, the detectives visited defendant's apartment and defendant reenacted the CPR he performed on the child. Subsequently, detectives also visited the mother's apartment in Irvington. Criminal charges were not filed against defendant until May 2006.

John's mother testified at trial pursuant to a grant of use immunity. The charges against her were still pending, and she received no promises in exchange for her testimony. She explained that after speaking with her lawyer and seeing the medical evidence, she understood that her son had been murdered, and she wanted justice for him. She did not care what happened to her.

The mother's trial testimony changed from prior accounts, except she stated that the child never took a bath the day before his death and never fell in or out of the tub. When she checked on her son when she awoke the next morning, he had no bruises on his face or side. John's mother left for work at about 5:30. Defendant walked her to the bus station. She did not return to defendant's apartment until approximately 5:00 p.m.

When John's mother arrived at defendant's apartment, she did not see John, and asked defendant for him. Defendant told her to sit down because there was something he had to tell her. He told her that John had been throwing up all day, so defendant gave him a bath and the child fell in the tub and had a bruise on his face.

John's mother entered the bedroom where she saw John laying on the bed, head facing the foot of the bed, with a big bruise on his face and a cut on his lips. He "looked different," tired, and his hands and feet were cold. "He said, 'Mommy,' softly," and he asked for something to drink.

She began asking defendant questions about what happened. Defendant said he did not see the boy fall; he had left the bathroom to get a towel. She asked defendant for some food, and he brought some from the kitchen. However, John did not eat even two spoonfuls of food, and when she attempted to put him on the floor, he could not stand. She asked defendant if anything else had happened that day and defendant said "no." He said John awoke with vomit all over him, had not wanted to eat, and had watched a little television.

The child's mother wanted to bring John to the hospital, but defendant refused because "they might think I did something to him." She thought John might be tired-she knew he had a cold—so she picked him up and tried to lay him on his stomach so he could sleep. As she did so, he was breathing very heavily, and he made a big noise. He had vomit all over his nose and mouth, so she and defendant rushed him to the bathroom and put his head under the

faucet. She saw his eyes roll back in his head, he went limp and stopped breathing. She called 9–1–1 while defendant attempted CPR pursuant to instructions relayed from the 9–1–1 operator through her. At that point in time, she had been home for about two hours.

John's mother admitted she fabricated the story about John falling in the bathtub at her home and repeated it to everyone who asked her what had happened to her son. She did so because she was married to John's father, who lived in Haiti. She was having an affair with defendant, and she did not know how she was going to explain what happened to her husband. She testified that defendant did not force her to lie, and she made up the story to protect herself. She had only known defendant a short time; their affair ended the day John died.

The investigation concerning the child's death was hampered by the mother's fabricated story and a dispute among some experts whether the child's death was accidental or a homicide. Although the medical examiner opined that the manner of death was homicide by blunt force trauma, he commented that some internal injuries could have occurred from improperly administered CPR. In addition, another professional, who did not testify at trial, opined that the death was accidental.

The State presented three expert witnesses who testified that John's wounds were incurred four to ten hours before his death, during the period of time he was in defendant's exclusive care. Moreover, the wounds were inflicted, not accidental, and they could not have occurred as the result of a fall in or out of a bathtub.

The State's first expert was Dr. Zhongxue Hua,[3] one of the medical examiners. He testified that the manner of death was homicide, with the injuries inflicted rather than accidental. He recounted the injuries found by the medical examiner who conducted the autopsy. He, too, opined that the injuries to the abdomen or the injuries to the brain were lethal in and of themselves.

In terms of timing, Hua opined that all of the contusions were fairly recent, because there were no signs of healing and signs of healing generally would be visible within four hours of an injury. Moreover, at the time of death, the child had bled out into his abdomen nearly eighty percent of his total blood volume. He stated that the child could not have survived very long with that

---

[3] "Zaretski, the medical examiner who conducted the autopsy, did not testify." *Merlain*, 2012 WL 986998, at *4.

volume of blood loss. Hua believed death occurred within several hours of the injuries.

Hua opined it was highly unlikely that the injuries had been caused by a short fall to a flat surface approximately twenty-four hours before death. The injury to the left eye was significant in that it was located underneath the eye, a non-protruding portion of the face; such an injury could not have occurred through a fall to a flat surface. Multiple lesions on the left side of the face overlaying each other and injuries to both the left and right side of the face were inconsistent with a fall. The injuries to John's spleen and kidney also were inconsistent with a short fall of three to four feet; the kidney in particular is a well-protected organ that is difficult to injure. Hua opined the injuries were more consistent with inflicted wounds-for example, being punched, kicked, or having one's head slammed against a surface by an individual of greater body size and muscle strength.

The State also presented Dr. Douglas Miller, an expert in neuropathology. Miller examined the child's brain at the request of the medical examiner's office. He found that the child had suffered a subdural hematoma on the right side, moderate brain swelling, and herniations/shifting of the brain tissue. The hematoma was acute, meaning that it was no older than twenty-four hours, and it would have been fatal, although the child's other injuries accelerated his death.

John's brain tissue also evidenced damage from oxygen loss and loss of blood supply. This damage was caused by a combination of both the cranial and abdominal bleeding, which had begun some four to ten hours before John died. As a result of his brain injuries, John could not have appeared normal prior to his collapse and death.

Miller concluded that the child suffered acute blunt head trauma, which caused the subdural hematoma, brain swelling, and herniations. The trauma occurred with significant force. It could not have occurred as a result of a short fall to the ground.

Miller further concluded that John's injuries had been caused by multiple inflicted blows. "There is no way that a single blow could have caused the injury to the spleen, and the kidney, and the abdomen, and to the head simultaneously. They are separate anatomic areas, even in a small child...." Moreover, the injuries to his face were "inconsistent with a single blow to the face, but [were] more consistent with, at least, two or three blows to the face." His injuries were inconsistent with the claim that he had fallen in the bathroom. It was "impossible" that they occurred in that manner.

Finally, the State presented Dr. Ernest G. Leva, an expert in pediatric medicine and child abuse. Leva reviewed John's case individually and as a member of the State's Child Fatality and Near Fatality Review Board (the Board). He was "absolutely convinced" that the child's injuries had "nothing to do with a minor fall in the bathtub," and the abdominal injuries were not consistent with CPR. Leva had never seen a child suffer such injuries from a fall from three to four feet in height as initially described by the child's mother. Further, he noted that the literature was consistent that minor falls did not result in serious injuries in children. Thus, Leva opined that John's injuries were inflicted.

In response, defendant presented the testimony of Dr. David Emery Wolfe, an expert in neuropathology. He agreed with Miller that John's subdural hematoma was acute, meaning that there were no signs of healing. However, he estimated that the hematoma occurred twenty-four to forty-eight hours before John's death, because one expects to see signs of healing within that time frame.

Wolfe also observed, as had Miller, that some brain cells had died due to loss of oxygen. He opined that this could have occurred anywhere between six and twelve hours after John suffered his injuries. However, he also concluded that the red neurons indicative of the dead brain cells occur in both fatal and non-fatal injuries, and could exist in the brain for a long period of time.

In terms of bruising, Wolfe opined that the bruise on the boy's face was related to the subdural hematoma, and was consistent with having occurred twenty-four hours before John's death. The bruise to John's abdomen had "ripened" in color and therefore had been there for at least twenty-four hours. While he acknowledged that, microscopically, there had been no evidence of healing, he claimed that fresh, acute bruises could not be dated histologically.

Wolfe concluded that the abdominal bleeding was "consistent with a start of bleeding on the time of the injury to the head." He claimed the spleen had suffered only a small laceration and would have bled slowly. Moreover, Wolfe believed the abdominal and head injuries occurred at the same time because the bruises in both areas could be dated to around the same time. Wolfe appeared to concede on cross-examination, however, that there was no reliable way to date acute bruises.

Finally, Wolfe opined that John's injuries were consistent with a fall out of a tub to a bathroom floor the day before his death. The child's height, plus the height of the tub, created sufficient

height to suffer a fatal head injury, especially since the surfaces in the bathroom were extremely hard and unyielding. Wolfe acknowledged that the study upon which he relied in reaching this opinion had been highly criticized, and addressed only head injuries, and not abdominal injuries such as those suffered by John. He claimed that critics of the study were biased.

Wolfe explained that typically a person who experiences a subdural hematoma has a lucid period immediately following the injury, which could last anywhere from minutes to weeks. However, as a result of the bleeding, they eventually suffer increased intracranial pressure, the symptoms of which can include nausea and explosive vomiting, lethargy, changes in body temperature, and ultimately dilation of the pupils, stupor, and loss of consciousness. He stated that John's behavior on the day of his death, as described by defendant, was indicative of such intracranial pressure.

*State v. Merlain*, No. 06–05–0421, 2012 WL 986998, at *1–7 (N.J. Super. App. Div. Mar. 26, 2012).

Following his conviction, Petitioner filed a direct appeal and three petitions for postconviction relief.  The Appellate Division summarized the state court procedural history as follows:

Defendant appealed his conviction and sentence. We affirmed, *State v. Merlain*, No. A-2294-08 (App. Div. Mar. 26, 2012), and the Supreme Court denied certification. *State v. Merlain*, 212 N.J. 287 (2012).

On December 10, 2012, defendant timely filed his first PCR petition pro se, alleging ineffective assistance of trial and appellate counsel. He was subsequently represented by counsel on the petition. On February 19, 2014, the PCR court denied the petition. The PCR court found defendant's claims as to trial counsel were "unsubstantiated," "inaccurate," and "unsustainable," were "unpersuasive" and "without merit" as to appellate counsel. We affirmed, *State v. Merlain*, No. A-3775-13 (App. Div. June 21, 2016), and the Court denied certification. *State v. Merlain*, 228 N.J. 45 (2016).

While his appeal was pending, on October 28, 2015, defendant filed a second PCR petition pro se, alleging ineffective assistance of PCR counsel. Defendant asserts in this appeal that the court denied the second PCR petition without prejudice due to the pending appeal; however, he did not provide a confirming order or

the date of the alleged denial. Nevertheless, his appeal of the denial
of his first PCR petition did not stay or toll the time to file the
second PCR petition. *See* R. 3:22-12(b) ("These time limitations
shall not be relaxed, except as provided herein"); *cf. State v. Milne*,
178 N.J. 486, 494 (2004) (Calculation of the five-year period under
Rule 2:22-12 is neither stayed nor tolled by appellate proceedings).

Accordingly, the second PCR petition was untimely under
Rule 3:22-12(a)(2)(C) because it alleged ineffective assistance of
PCR counsel on the first PCR petition and was filed more than one
year after the date of the denial of the first petition. The second
PCR petition was also barred under Rule 3:22-4(b)(1) because it
was untimely under Rule 3:22-12(a)(2)(C).

On December 6, 2016, defendant filed a third PCR petition
pro se, alleging ineffective assistance of first PCR counsel and
PCR appellate counsel.[4] On March 15, 2017, the PCR court denied
the petition as untimely under Rule 3:22-12(a)(2)(C) and barred
under Rule 3:22-4(b).

*State v. Merlain*, NO. No. A-3869-16T2, 2018 WL 5260429, at *1 (N.J. Super. App. Div. Oct.

23, 2018).

Petitioner appealed the denial of his third PCR.  The Appellate Division first held that

Petitioner's claims of "trial errors" were procedurally barred under Rules 3:22-5 and 3:22-4.  *See*

*id.* at *2.  The Appellate Division next held that "[t]he third PCR petition was untimely as to first

PCR counsel under Rule 3:22-12(a)(2)(C) and barred under Rule 3:22-4(b)."  *See id.*  The

Appellate Division also rejected the claims against first PCR counsel and PCR appellate counsel

on the merits as follows:

Defendant makes nothing but bald assertions that PCR counsel, as
well as PCR appellate counsel, rendered ineffective assistance.
Defendant filed his second and third PCR petitions pro se and
provided no affidavits or certifications, including his own, to
support his claims against either counsel.

---

[4] "Defendant claims this was a "refiling" of his second PCR petition; however, it was a third
PCR petition that raised additional claims against PCR appellate counsel." *State v. Merlain*, No.
A-3869-16T2, 2018 WL 5260429, at *1 (N.J. Super. App. Div. Oct. 23, 2018).

*Id.* at \*3.  The New Jersey Supreme Court denied Petitioner's petition for certification from the denial of his third PCR petition on September 4, 2019.  *See* 239 N.J. 70 (2019).

Petitioner filed his federal habeas petition on or about March 16, 2020.  *See* ECF No. 1 at 15; *see also* ECF No. 1-1.  After seeking an extension of time to respond, the state filed a motion to dismiss the petition as untimely on November 18, 2021.  ECF No. 8.  On June 15, 2022, the Court denied the motion to dismiss the petition as untimely and found that, based on the record provided, the state court had only time barred petitioner's claims against his first PCR counsel and dismissed the claims against PCR appellate counsel on the merits.[5]  *See* ECF No. 13.  The Court therefore declined to dismiss the petition as untimely and directed the state to file its full answer.  *See id.*

On August 26, 2022, the state filed its answer, which the Court accepted as within time. *See* ECF No. 16.  The Court also provided petitioner an extension of time to submit his reply brief, which was due by April 14, 2023.  *See id.*   Petitioner, however, did not submit a reply brief within that time frame.

## II.   **STANDARD OF REVIEW**

Prior to bringing a federal habeas petition under 28 U.S.C. § 2254(b)(1)(A), a state prisoner must exhaust his state remedies.  Nevertheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2).  If a state prisoner's constitutional claim has been barred in the state courts on independent and adequate state law grounds, there

_____

[5] The Court also denied petitioner's request for a default judgment.  *See id.*

has been a procedural default, and a habeas court cannot review the claim absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 729, 750 (1991).

If a constitutional claim has been exhausted,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Third Circuit directed habeas courts to follow a two-step analysis under § 2254(d)(1). *See Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 253 (3d Cir. 2020) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (en banc), *cert. denied* 528 U.S. 824 (1999)). First, courts should "determine what the clearly established Supreme Court decisional law was at the time Petitioner's conviction became final" and "identify whether the Supreme Court has articulated a rule specific enough to trigger 'contrary to' review." *Id.* at 253 (quoting *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004)). "The 'clearly established Federal law' provision requires Supreme Court decisions to be viewed through a 'sharply focused lens.'" *Id.* Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), only if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405-06.  Second, if Supreme Court precedent is not specific enough to trigger contrary review, habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent."  *Rosen*, 972 F.3d at 253 (quoting *Matteo*, 171 F.3d at 888)).

Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410).  For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent."  *Rosen*, 972 F.3d at 252 (quoting *Matteo*, 171 F.3d at 890)).  A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion."  *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020), or, in other words, whether "every fairminded jurist would disagree" with the state court.  *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021).

A petitioner who claims that the state court's adjudication of his claim was based on an unreasonable factual determination under § 2254(d)(2), faces a similarly heavy burden of proof because "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockerell*, 537 U.S. 322, 340 (2003).  "The petitioner must show that the state court verdict was based on an unreasonable determination of the evidence and that a reasonable factfinder could not have reached the same

conclusion." *Rosen*, 972 F.3d at 252 (3d Cir. 2020) (citing *Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000)).

"Although state prisoners may sometimes submit new evidence in federal court," the habeas statute, "is designed to strongly discourage them from doing so." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). "Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Id.* (quoting *Williams*, 529 U.S. at 437 (additional citations omitted)). Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 180-81.

## III.   DISCUSSION

### a.   Non-Cognizable Claims

As noted by the state in its answer, Petitioner purportedly presents three "grounds" for relief, but several of his claims within those grounds for relief are not independently cognizable on federal habeas review, and the Court denies these claims for relief in this section.

Petitioner's generalized claims that PCR counsel and appellate PCR counsel provided ineffective assistance of counsel are not independently cognizable on habeas review. Indeed, there is no federal constitutional right to counsel in PCR proceedings, *see Coleman*, 501 U.S. at 752, and the habeas statute precludes the court from granting relief on such claims in a federal habeas petition. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). The Court, therefore, denies Petitioner's claims asserting ineffective assistance of PCR counsel and appellate PCR counsel.

The Court also agrees with the state that the state court's timeliness rulings and interpretation of its procedural rules are solely a matter of state law and cannot form the basis for an independent federal claim for habeas relief.  Habeas relief in federal Courts is only available for violations of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Violations of state law, including evidentiary rulings and violations of state rules of criminal procedure, or court rules cannot be the basis for granting habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (reemphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions ... a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Relatedly, the Court does not sit as a super-appellate court over the state courts, and thus has no authority 1) to remand this matter to state court based on the state court's purportedly erroneous application of state court rules governing the time limits for successive petitions for postconviction relief or 2) require the state courts to consider the merits of the claims in Petitioner's second and third PCR.  For these reasons, the Court denies relief on Petitioner's claims challenging the state court's application of it rules governing successive petitions for postconviction relief and seeking a remand order to state court.

### b.  Sufficiency of the Evidence

In Ground Three, Petitioner argues that there was insufficient evidence to establish the *mens rea* necessary for his conviction for knowing or purposeful serious bodily injury murder (referred to as "SBI Murder"), pursuant to N.J.S.A. 2C:11–3a(1) and (2), and that the trial judge erred by denying a motion for a judgment of acquittal.

After the State rested at trial, petitioner moved for an acquittal. *See* Ex. 42, 16T111-1 to 14.  The trial judge denied the motion and provided the following explanation:

> The testimony, as even acknowledged by the defendant Merlain in his statement, is that he had sole custody of the child from 5:30 in the morning to 5, 5:30 at night. The date of death is August the 8th. Time is 8:36. The doctors have opined that the death occurred sometime between four hours and ten hours, that is Doctor Miller, and Doctor Hua also between four to ten hours is when the time of death occurred, and the only person in the custody of that child, at that time, was the defendant. The opinion of the doctors, all doctors is that this was caused by blunt force trauma and, as a result, there is sufficient basis for this matter to go to the jury.

Ex. 42, 16T112-1 to 13.

Petitioner argued on direct appeal that the trial court should have granted the motion for acquittal as to SBI Murder because the prosecution failed to prove that Defendant had the requisite mental state. *See Merlain*, 2012 WL 986998, at *7. The Appellate Division provided a detailed analysis in rejecting this claim. It first recognized that "[t]o sustain a conviction, the State must prove all elements of a criminal charge beyond a reasonable doubt" (citing *In re Winship*, 397 U.S. 358, 364 (1970), and addressed the elements of purposeful or knowing SBI Murder, as set forth in *State v. Cruz*, 163 N.J. 403, 418 (2000). The Court then applied those elements to the evidence in Petitioner's case and rejected his claim as follows:

> In this case, the State's evidence was sufficient to prove serious bodily injury murder as set forth in *Cruz*. We have recounted at length the autopsy findings and the testimony of the three experts produced by the State. All agreed that the injuries were inflicted between four and ten hours before John's death, when he was in defendant's exclusive care. All agreed that John's injuries were inflicted by multiple blows to the head and body, using great force. The laceration to the kidney was especially telling as to the substantial force used against the child, as Hua explained that the organ is very well protected and difficult to injure.

> The child was only two years old at the time of his death, only 35½ inches tall and 25 to 35 pounds. Defendant, by contrast, was a grown man. In August 2004, he was thirty-four years old, five feet eight inches tall, and weighed approximately 180 pounds.

> Finally, defendant deflected the mother's desire to seek immediate medical care. Defendant refused because "they might think I did

something to him," indicating his knowledge that the multiple blows inflicted by him severely threatened the child's well-being.

It was reasonable for the jurors to conclude that by repeatedly, forcefully hitting such a small child, and refusing to seek medical care for him afterward, defendant intended to cause serious bodily injury, with death a highly probable result. That is, the circumstantial evidence supports a conclusion that: it was defendant's conscious object to cause serious bodily injury that then resulted in John's death, he knew that the injury created a substantial risk of death and that it was highly probable that death would result. Alternatively, the evidence demonstrated defendant was aware that it was practically certain that his conduct would cause serious bodily injury that resulted in the child's death, knew that the injury created a substantial risk of death, and that it was highly probable that death would result.

*Merlain*, 2012 WL 986998, at *11–13; *see also* Ex. 6 at 31–33.  The Appellate Division did not

unreasonably apply clearly established federal law in rejecting Petitioner's sufficiency of the

evidence claim and affirming the denial of Petitioner's motion for acquittal.

The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Travillion v. Superintendent*

*Rockview SCI*, 982 F.3d 896, 902 (3d Cir. 2020) ("[T]he clearly established federal law

governing the insufficient evidence claim is the standard set out by the Supreme Court in

Jackson . . . .").  The dispositive question under *Jackson* is "whether the record evidence could

reasonably support a finding of guilt beyond a reasonable doubt." *Id.* at 318. Put another way, "a

reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no

rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

The analysis under *Jackson* requires courts to analyze the "substantive elements of the criminal

offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.  In conducting this review, "all of the evidence is to be considered in the light most favorable to the prosecution." *Id.*; *see also Orban v. Vaughn*, 123 F.3d 727, 731 (3d Cir. 1997). Thus, where the evidence could support conflicting inferences, the habeas court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 326; *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011). "What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

In resolving petitioner's claim, the Appellate Division properly relied on the rule of *In re Winship*, *supra*, and *State v. Cruz*, 163 N.J. 403, 418 (2000), which sets forth the legal standard necessary to prove SBI Murder under N.J.S.A. 2C:11-3(a)(1) or (2).  Under that statute, "criminal homicide constitutes murder when: (1) The actor purposely causes death or serious bodily injury resulting in death; or (2) The actor knowingly causes death or serious bodily injury resulting in death . . . ." N.J.S.A. 2C:11-3(a).[6]

---

[6] A separate statute explains that

> [w]hen the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation . . . of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

N.J.S.A. 2C:2-3(b).

Petitioner was prosecuted under a serious-bodily-injury (SBI) theory of murder, i.e., that he purposely or knowingly caused serious bodily injury resulting in death.  A defendant may be convicted of purposeful SBI murder "if the actor's purpose was to inflict serious bodily injury, but the actor nevertheless 'knew that the injury created a substantial risk of death and that it was highly probable that death would result.'" *State v. Wilder*, 939 A.2d 781, 787 (N.J. 2008) (quoting *State v. Cruz*, 749 A.2d 832, 840 (N.J. 2000)). By contrast, a defendant is guilty of knowing SBI murder under the same standard, but "'rather than proving that serious bodily injury was [the] defendant's conscious objective, it . . . demonstrate[s] that he was aware that it was practically certain that his conduct would cause serious bodily injury.'" *Wilder*, 939 A.2d at 787 (alteration in original) (quoting *State v. Jenkins*, 840 A.2d 242, 251 (N.J. 2004)).  Under either theory, the state must also prove that the defendant's conduct in fact caused the death.  *Id.*

Contrary to petitioner's arguments, the state did not need to prove beyond a reasonable doubt that petitioner "intended to commit murder."  Nor did it need to show that John's death was "within the defendant's design."  Instead, the state was required to prove the elements of purposeful or knowing SBI murder.

As the Appellate Division emphasized, the state's three expert witnesses all agreed that John's injuries had occurred between four and ten hours before his death, and that there was no dispute John was in petitioner's care during that time.  Ex. 6 at 31.  It further noted that the state's experts agreed that two-year-old victim's injuries "were inflicted by multiple blows to the head and body, using great force." Ex. 6 at 31–32.  It stressed that "[t]he laceration to the kidney was especially telling as to the substantial force used against the child, as Hua explained that the organ is very well protected and difficult to injure."  Ex. 6 at 31–32.  The court also considered petitioner's attempts to convince John's mother not to seek medical care. Ex. 6 at 32.  The

Appellate Division held that it was reasonable for the jurors to conclude that by repeatedly, forcefully hitting such a small child, and refusing to seek medical care for him afterward, defendant intended to cause serious bodily injury, with death a highly probable result. *See* Ex. 6 at 32–33.

The Court agrees with the state that the Appellate Division properly considered the evidence and deferred to the jury's reasonable conclusion that petitioner committed knowing or purposeful SBI murder. The state court's analysis and determination are consistent with federal law, *see Johnson*, 566 U.S. at 651, and not objectively unreasonable. *See Renico*, 559 U.S. at 773. The Court therefore denies relief on the sufficiency of the evidence claim.

### c. **Erroneous Jury Instructions**

In Ground Three, Petitioner also complains that the jury instructions for SBI murder were erroneous and confusing and denied him due process. Although he did not object on this basis before or during the jury charge, petitioner moved for a new trial based on an alleged failure by the judge to adequately distinguish SBI murder, aggravated manslaughter, and reckless manslaughter. *See* Ex. 50, 24T3-13 to 7-23. On direct appeal, petitioner claimed that the judge's decision, when the jury requested a written copy of the homicide instructions, to re-read the pertinent instructions, rather than to elaborate in some manner on the differences between SBI murder, aggravated manslaughter, and reckless manslaughter, constituted plain error.

The Appellate Division analyzed this issue thoroughly and rejected petitioner's arguments as follows:

> Defendant contends the trial judge committed plain error when, in response to a jury question, he failed to distinguish adequately serious bodily injury murder from the lesser included offenses of aggravated manslaughter and reckless manslaughter. We disagree.

The trial judge charged the jury on serious bodily injury murder, and the lesser included offenses of aggravated manslaughter and reckless manslaughter. In so doing, the judge followed the model jury charge for those offenses, reciting it nearly verbatim. Model Jury Charge (Criminal), "Murder and Aggravated/Reckless Manslaughter" (2004). As to the murder charge, however, the judge included only the language relating to serious bodily injury murder because defendant was not charged with purposefully or knowingly causing the child's death.[7] The judge also omitted the model charge language relating to the use of deadly weapons, as that was not an issue presented in this case.

Defendant did not object to the charge on the ground that it was confusing or failed to adequately distinguish between serious bodily injury murder and the lesser included offenses. Upon an objection by the State, however, and with input from defense counsel, the judge clarified certain aspects of the charge.

During deliberations, the jurors requested "Count One, definition, all," and the judge responded by reading the entire charge for murder, aggravated manslaughter, and manslaughter. Defense counsel did not object. The judge issued a minor clarification based upon an objection by the prosecutor.

The jurors retired to deliberate, but returned approximately forty minutes later to ask: "Question, can we have a written copy of Count One," and "If not, can we have it read again and can we take notes?" Both defense counsel and the prosecutor agreed that the jurors should have the charge read back to them, without letting them take notes.

Defense counsel objected to the judge issuing a "parsed charge," however, because it might be causing confusion. He asked that the judge read the entire charge as set forth in the model charge, including the uncharged theory that defendant purposefully or knowingly caused John's death, and the theory the State charged, that defendant purposefully or knowingly caused serious bodily injury that resulted in John's death. The prosecutor argued that the jury should only be instructed on the charged theory of serious bodily injury murder.  The trial judge adopted the State position and re-issued the charge on serious bodily injury murder, aggravated manslaughter, and reckless manslaughter. The judge did not permit the jurors to take notes. Three hours later, the jury returned a verdict of guilty on murder and endangering the welfare of a child.

---

[7] "The trial judge initially charged both types of murder, but corrected himself upon an objection by the prosecutor."  *Merlain*, 2012 WL 986998, at *14.

In his motion for a new trial, defense counsel argued that the charge failed to differentiate adequately between serious bodily injury murder and aggravated manslaughter. The judge denied the motion, holding that the charge clearly distinguished between the two crimes.

Defendant did not make a timely objection to the charge on the ground he is now raising on appeal; therefore, we apply the plain error standard. R. 1:7–2; R. 1:7–5; R. 2:10–2; *State v. R.B.*, 183 N.J. 308, 321–22 (2005). As explained by the Court,

plain error in the context of a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Jordan*, 147 N.J. 409, 422 (1997) (citations omitted).

[*State v. Adams*, 194 N.J. 186, 207 (2008).]

"Because of the importance of proper instructions to the right of trial by jury, erroneous instructions on matters or issues material to the jury's deliberations are presumed to be reversible error." *State v. Collier*, 90 N.J. 117, 122–23 (1982); *State v. Eldridge*, 388 N.J. Super. 485, 496 (App. Div. 2006), *certif. denied*, 189 N.J. 650 (2007). They are poor candidates for rehabilitation under the plain error doctrine. *State v. Torres*, 183 N.J. 554, 564 (2005); *Jordan*, *supra*, 147 N.J. at 422.

Criminal homicide constitutes murder when the actor purposely or knowingly "causes ... serious bodily injury resulting in death." N.J.S.A. 2C:11–3a(1), (2). In *State v. Cruz*, the Court required that the following charge be issued in capital cases in which the State sought conviction for serious bodily injury murder:

In order for you to find the defendant guilty of murder, the State is required to prove each of the following elements beyond a reasonable doubt:

(1) that the defendant caused the victim's death or serious bodily injury that then resulted in the victim's death, and

(2) that the defendant did so purposely or knowingly.

A person who causes another's death does so purposely when it is the person's conscious object to cause death or serious bodily injury. A person who causes another's death does so knowingly when the person is aware that it is practically certain that his conduct will cause death or serious bodily injury.

Whether the killing is committed purposely or knowingly, causing death or serious bodily injury must be within the design or contemplation of the defendant.

"Serious bodily injury" means bodily injury that creates a substantial risk of death. A substantial risk of death exists where it is highly probable that the injury will result in death.

All jurors do not have to agree unanimously concerning which form of murder is present so long as all believe it was one form of murder or the other. However, for a defendant to be subject to capital punishment, all jurors must agree that the defendant by his own conduct either purposely or knowingly caused death or serious bodily injury. All jurors must also agree that the defendant knew of and disregarded a substantial risk of death-that is, that it was highly probable that death would result from the infliction of serious bodily injury.

[163 N.J. at 419–20.]

In terms of the lesser included offenses, under N.J.S.A. 2C:11–4a(1), criminal homicide constitutes aggravated manslaughter when "[t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life...." Under N.J.S.A. 2C:11–4b(1), criminal homicide constitutes manslaughter when "[it] is committed recklessly...."

Aggravated manslaughter involves a lower degree of culpability than murder. To prove aggravated manslaughter, the State must show only "that the defendant was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life." *Cruz*, *supra*, 163 N.J. at 417. *Accord Wilder*, *supra*, 193 N.J. at 408–09; *Jenkins*, *supra*, 178 N.J. at 362–63.

"In assessing whether a defendant has manifested extreme indifference to human life, the focus is not on the defendant's state of mind, but on the circumstances under which the defendant acted." Cannel, New Jersey Criminal Code Annotated, comment 2 on N.J.S.A. 2C:11–4 (2010). *Accord State v. Gaines*, 377 N.J. Super. 612, 621 (App. Div.), *certif. denied*, 185 N.J. 264 (2005); *State v. Curtis*, 195 N.J. Super. 354, 364–65 (App. Div.), *certif. denied*, 99 N.J. 212 (1984).

In *State v. Jenkins*, the Court explained the differences between murder, aggravated manslaughter, and reckless manslaughter, stating:

[T]he following key distinctions emerge. To be guilty of SBI murder, the defendant must have knowingly or purposely

inflicted serious bodily injury with actual knowledge that the injury created a substantial risk of death and that it was "highly probable" that death would result. In aggravated manslaughter, by contrast, the defendant must have caused death with an "awareness and conscious disregard of the probability of death." If, instead, the defendant disregarded only a "possibility" of death, the result is reckless manslaughter.

....

... [T]he proper inquiry in distinguishing murder from the two degrees of manslaughter relates to defendant's state of mind as to the risk of death.

[178 N.J. at 363 (internal citations omitted).]

See also Curtis, supra, 195 N.J. Super. at 363–65 (difference between aggravated manslaughter and reckless manslaughter is difference in degree of risk that death will result from the defendant's conduct—whether death is a probability or a mere possibility).

To be sure, differentiating between the three crimes is a complex endeavor. And it surely was one of the most difficult issues for the jury to resolve in this case, as it is for juries in most cases of this nature. See, e.g., State v. Ruiz, 399 N.J. Super. 86 (App. Div.2008) (defendant acquitted of aggravated manslaughter with respect to killing of fifteen-month-old, and jury deadlocked on lesser included offense of reckless manslaughter); State v. Messino, 378 N.J. Super. 559 (App. Div.) (defendant convicted of aggravated manslaughter, not murder, with respect to killing of two-year-old), certif. denied, 185 N.J. 297 (2005). In this regard, the jurors' requests for clarification reflect their diligent efforts to reach a verdict consistent with the law and the facts as they found them; the requests are not indicative of any error or confusion in the charge issued by the trial judge.

"Appropriate and proper charges to a jury are essential to a fair trial." State v. Green, 86 N.J. 281, 287 (1981). They are most critical in criminal cases "when a person's liberty is at stake." Id. at 289.

Here, the trial judge issued instructions that tracked the relevant model jury charge and were consistent with the governing law on serious bodily injury murder, aggravated manslaughter, and reckless manslaughter, as set forth above. Using a model jury charge, as the trial judge did here, will rarely result in plain error. R.B., supra, 183 N.J. at 325; Mogull v. CB Commercial Real Estate Grp., L.P., 162 N.J. 449, 466 (2000). We find no error, much less plain error, in this instance.

*Merlain*, 2012 WL 986998, at *14–17.

"Questions related to jury charges are normally matters of state law and are not cognizable in federal habeas review." *Paulino v. Ortiz*, No. 03–4463, 2005 WL 2922369, at *4 (D.N.J. Nov. 4, 2005); *see also Estelle*, 502 U.S. at 71–72 ("the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief"). Habeas relief is thus available only "when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." *See Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007) (citation omitted). The petitioner must demonstrate that the failure to include the limiting instruction was prejudicial. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). This burden is "even greater than the showing required to establish plain error on direct appeal." *Id.* Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* "[U]nless [the error] had [a] substantial and injurious effect or influence in determining the jury's verdict," it is deemed harmless. *See Adamson v. Cathel*, 633 F.3d 248, 259 (3d Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)).

Typically, in the context of jury instructions, Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir.1997); *see also Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (instructions that suggest jury may convict without proving each element of crime beyond reasonable doubt violate constitutional rights of accused); *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (ambiguity, inconsistency or deficiency in instruction does not by itself necessarily constitute due process violation absent a reasonable likelihood that jury applied instruction so as to relieve state of its burden of proving each element of crime beyond reasonable doubt).

Here, the Appellate Division did not unreasonably apply clearly established federal law in denying Petitioner's jury charge claim and finding that the trial judge read the proper instructions, closely followed the model jury instructions on SBI murder and the potential lesser-included offenses of aggravated and reckless manslaughter, and ultimately read these instructions to the jury three times. Petitioner's argument on this issue highlights isolated sentences of the charge which he apparently believes are incorrect, but his approach fails to consider the charges as a whole and in context.

The Court has reviewed the relevant charges provided by the trial court, and contrary to Petitioner's suggestion, the charges, read as a whole, did not imply to the jury that it could convict petitioner of murder simply upon finding that he had purposefully or knowingly injured John. Instead, trial court consistently explained that the State must also prove beyond a reasonable doubt that it was either petitioner's "conscious object to cause serious bodily injury resulting in death" or that petitioner was "aware that it [wa]s practically certain that his conduct w[ould] cause serious bodily injury resulting in death." Ex. 47, 21T80-2 to 9; Ex. 49, 23T5-22 to 6-4, 26-12 to 19. As Petitioner concedes, this instruction is correct, and he presents no viable claim with the jury instructions. Thus, nothing in the jury charges had the capacity to mislead or corrupt the jury's deliberations, and the Court denies relief on this claim.

### d. Prosecutorial Misconduct

In Ground Three of the Petition, Petitioner also argues that the prosecutor made statements in her closing that misstated the elements of SBI murder. These statements coupled with the erroneous jury instructions purportedly denied Petitioner a fair trial. In his direct appeal, Petitioner challenged the prosecutor's summary of the elements of SBI murder, among other claims of prosecutorial misconduct. The Appellate Division rejected Petitioner's claim that

the prosecutor misstated the elements of SBI murder as "without sufficient merit to warrant discussion in a written opinion," citing R. 2:11–3(e)(2).[8]  *See Merlain*, 2012 WL 986998, at *21.

A petitioner bears a heavy burden to show he is entitled to federal habeas relief for prosecutorial misconduct.  Indeed, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).  Habeas relief is warranted only if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012).  "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).  The Court must also weigh whether the offending conduct "had a substantial and injurious effect or influence" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

In her closing, the prosecutor argued that the evidence showed that the severe nature of John's injuries, and in particular, the two separately fatal blows he received during the time he was in Petitioner's exclusive care, supported Petitioner's conviction for SBI murder.  The

---

[8] In his Petition, Petitioner asks the Court to review all the claims he raised on direct appeal.  *See* ECF No. 1-1, Supporting Memorandum at 4.  In Petitioner's direct appeal, the Appellate Division considered this claim among several alleged instances of prosecutorial misconduct. The Appellate Division agreed with the trial court that the prosecutor's statement that it was "too late to save John" was improper, but it found the trial court's prompt curative instruction sufficient. *See* Ex. 6 at 53.  The Court has reviewed the Appellate Court's resolution of this claim, and the remaining prosecutorial misconduct claims, and finds that the appellate court did not violate clearly established law in rejecting Petitioner's arguments for relief.

prosecutor began this argument by attempting to distinguish between premeditated murder and

SBI murder:

> Why do the facts of this case support a conviction for murder?  You remember in my opening statement to I spoke to you about an SBI murder.  I said to you the defendant didn't wake in the morning and he didn't say today I am going to kill [the victim]. He didn't say I am going to kill [the victim] on purpose.  He didn't say I'm knowingly going to cause the death of [the victim].  What he did was knowingly and purposely inflict serious bodily injury.

> These are the facts, ladies and gentlemen.  You heard about them in the testimony and you saw them in the photos, two fatal, lethal blows. You know from the fact that they were fatal and from the fact that they were lethal that they were inflicted blows. You heard about the force that would be required to sustain these injuries.

> The next thing I'm showing you is what the law is, that it was the defendant's – you know from the force of these blows that it was his conscious object to inflict serious bodily injury, that there was a probability that these injuries would result in death.

Ex. 46, 20T3-13 to 4-9.

In this context, the prosecutor stated portions of the mental-state requirements of SBI

murder, asserting that it was petitioner's "conscious object to inflict serious bodily injury, [and]

that there was a probability that these injuries would result in death." Ex. 46, 20T4-4 to 9.

Petitioner argues that the mental state for SBI murder requires actual knowledge that the injury

created a substantial risk of death and that it was "highly probable" that death would result.

Plaintiff further contends that the confusing jury charges on SBI murder provided by the trial

court compounded the confusion.  The Court has already rejected Petitioner's arguments that the

jury charges with respect to SBI murder were faulty and denied Petitioner a fair trial.

At issue then is whether the prosecutor isolated reference to the legal elements of SBI

murder violated Petitioner's due process rights.  Aside from the brief mention of the elements of

SBI murder at the beginning of the summation, the prosecutor did not dwell on the law or make

any effort to explain the law to the jury.  To the extent her comments were an inexact paraphrase

of the law, there is no indication her brief remarks could overcome the judge's clear and repeated

instructions on the elements in the jury charge that followed. And, taken in context, petitioner's

counsel had just completed his summation by reviewing the levels of mens rea required for SBI

murder, aggravated manslaughter, and reckless manslaughter.  Ex. 47, 21T48-11 to 49-20.

Under these circumstances, the Appellate Division was not unreasonable in finding that this

claim was without merit.  As such, the Court denies relief on the prosecutorial misconduct claim.

### e.   Violations of Confrontation Clause

In his direct appeal, Petitioner claimed that the Confrontation Clause was violated by the

testimony of Leva, one of the state's experts.  The Appellate Division provided the following

factual context for this claim:

> During the cross-examination of Leva, one of the State's
> experts, one of defense counsel's questions elicited information
> about Dr. Morgan–Glenn, a non-testifying expert. Morgan–Glenn
> had rendered an opinion that John's death was not accidental.
> When Leva referred to Morgan–Glenn's opinion, defense counsel
> objected, but the trial judge overruled the objection. On appeal,
> defendant contends the judge denied his right to confront this
> expert witness.
>
> Consideration of this issue requires an understanding of
> defendant's trial strategy. At trial, defense counsel vigorously
> challenged the State's investigation into John's death. Defense
> counsel introduced the idea that at some point the investigation of
> the child's death had been suspended, suggesting that there was
> some question as to whether the death had been accidental or
> criminal. In addition, defense counsel questioned the quality of the
> work performed by Zaretski, the medical examiner who performed
> the autopsy on John but did not testify.
>
> Defense counsel pursued both lines of attack during Leva's
> testimony. On direct examination by the prosecutor, Leva testified
> that he served as Vice Chairman of the Board, which "evaluate[s]
> all of the child fatalities in the State of New Jersey." He had
> reviewed John's case both as a member of that Board, and as an
> expert for the State.

In an obvious response to defense counsel's earlier cross-examination of Hua, the prosecutor elicited from Leva that the Board had written to the prosecutor regarding the case because of its disagreement with Zaretski's conclusion that John's internal injuries could have been caused by CPR. Leva responded the Board disagreed with Zaretski's conclusion.

During Leva's testimony on direct examination, he stated only that, in reaching his conclusion that John's injuries were inflicted, not accidental, he reviewed a number of reports, including one authored by Morgan–Glenn. He described Morgan–Glenn as a pediatrician practicing in the northern portion of the State, who also works with the Child Protection Center.

On cross-examination, defense counsel attempted to clarify Leva's concerns about Zaretski's conclusions, and the reasons the Board contacted the prosecutor's office about the case. He asked Leva, among other things, whether he "had information that the death was caused by natural causes," whether he had "received information at the ... Board that [the Division of Youth & Family Services (DYFS) ] had closed their file," and whether he had "receive[d] information that the investigation at the Union County Prosecutor's Office was suspended."

Continuing with that portion of the cross-examination, defense counsel specifically asked:

Q. Okay. You know, you mentioned some of the concerns that the Board felt that this was not the result of an accident. What were some of the other concerns that you had that you brought to Ms. Luvera's attention?

A. You'd have to read the letter.

Q. You don't have any specific recollection at all?

A. Of the concerns?

Q. Yeah.

A. Other than the fact that we believed the injuries were not consistent with the manner of death as per the medical examiner, I—I'm hard-pressed to believe that we commented on any investigation or anything like that. I believe we also pointed out that Dr. Morgan–Glenn believed that these were—

Q. Could you not give the opinion of another doctor?

THE COURT: Overruled. You asked the question. You may answer it.

[DEFENSE COUNSEL]: Okay.

THE COURT: Okay is right. You may continue to answer the question.

A. <u>I believe that we also pointed out the fact that Dr. Morgan–Glenn was convinced that these were non-accidental injuries.</u>

[Emphasis added.]

The underlined testimony is the testimony about which defendant complains on appeal.

On re-direct, the prosecutor followed up on this aspect of the cross-examination, questioning Leva as follows:

Q. I am going to show you what's been marked as S–23 for identification and ask you if you recognize that?

A. Yes, I do recognize this. This was the report by the medical diagnostic team authored by Dr. Morgan–Glenn.

Q. And did Dr. Morgan–Glenn's report become part of your review on the Child Fatality Review Board of this particular case?

A. Yes, it did.

Q. And I'm going to direct you to Page 3 of Dr. Morgan–Glenn's report and I'm going to point to the fourth full paragraph and just ask you just to read the last sentence of that paragraph just to yourself and then I will ask you—

A. This one?

Q. This one, this last sentence to yourself.

A. Okay.

Q. Does that refresh your recollection as to what information you obtained as a member of the Board relating to DYFS, law enforcement and findings?

A. Yes, it does.

Q. And what information did you have?

A. "No arrests were made and the case was closed reportedly as homicide by CPR or accidental homicide (per DYFS report of law enforcement findings)."

....

Q. The information came to the Board through DYFS, through law enforcement?

[DEFENSE COUNSEL]: Objection, Judge.

THE COURT: Your objection is noted. I overrule it.

A. Yes.

The prosecutor then proceeded to question Leva about the letter he and another doctor, Dr. D'Urso, had written to the Union County Prosecutor on behalf of the Board. In the letter, Leva and D'Urso noted the Board's review of statements made by defendant and the mother, as well as Zaretski's report, and Morgan–Glenn's report. Ultimately, the letter concluded: "The Board has seldom seen a case in which the gross anatomical findings, cause of death and manner of death were so obviously intentionally inflicted."

On re-cross examination, defense counsel questioned the validity of the Board's conclusion by questioning the make-up of the Board and the nature of their review. Counsel then reverted to the overriding theme of the defense, confirming with Leva the Board's disagreement with Zaretski's conclusions and its request that the investigation into John's death be renewed.

The following day, defendant moved for a mistrial based upon, among other things, the admission of Leva's testimony about the substance of Morgan–Glenn's opinion. The trial judge denied the motion, noting that the testimony was in response to questions posed by defense counsel, and was necessary to respond to an issue raised by the defense.

Post-trial, defendant moved for a new trial on a number of grounds, including the admission of testimony about Morgan–Glenn's conclusion. The trial judge denied the motion, stating, in pertinent part, that defense counsel had invited Leva's testimony about Morgan–Glenn's opinion by aggressively suggesting that the State had poorly investigated the case, and by prodding Leva to reveal the specifics of the Board's concerns about the investigation.

*Merlain*, 2012 WL 986998, at *17–19.

In resolving this claim, the Appellate Division acknowledged that to the extent the challenged statement was a testimonial hearsay statement, its admission would violate the Confrontation Clause, and the court cited to the relevant federal law for Confrontation Clause violations. *See id.* at *19-20. The Appellate Division nevertheless found

the admission of the ultimate opinion of Morgan–Glenn was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L. Ed.2d 705, 710–11 (1967). There is no reason to believe that the jury's verdict was in any way affected by the fleeting reference to Morgan–Glenn's

> opinion. The record reflects three lines of testimony in a trial of
> approximately three weeks' duration, with seven full days of
> testimony from fifteen witnesses, including three expert witnesses
> for the State. The State's experts testified over four days as to the
> bases for their opinions that the child's injuries were inflicted, not
> accidental.

*Merlain*, 2012 WL 986998, at \*20.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

him[.]" U.S. Const. amend. VI. Under the Confrontation Clause, "[A] witness's testimony

against a defendant is [ ] inadmissible unless the witness appears at trial or, if the witness is

unavailable, the defendant had a prior opportunity for cross-examination." *Melendez–Diaz v.*

*Massachusetts*, 557 U.S. 305, 309 (2009).

It is well established that Confrontation Clause errors, are subject to harmless error

analysis under *Chapman v. California*, 386 U.S. 18, 24 (1967). *See Delaware v. Van Arsdall*,

475 U.S. 673, 684 (1986). Under *Chapman* "a preserved claim of constitutional error identified

on direct appeal does not require reversal of a conviction if the prosecution can establish that the

error was harmless beyond a reasonable doubt." *Brown v. Davenport*, 142 S.Ct. 1510, 1518

(2022) (citing *Chapman*, 386 U.S. at 24).

> Whether such an error is harmless in a particular case depends
> upon a host of factors, all readily accessible to reviewing courts.
> These factors include the importance of the witness' testimony in
> the prosecution's case, whether the testimony was cumulative, the
> presence or absence of evidence corroborating or contradicting the
> testimony of the witness on material points, the extent of cross-
> examination otherwise permitted, and, of course, the overall
> strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.

Moreover, "a state court's harmless-error determination qualifies as an adjudication on

the merits under AEDPA." *Brown v. Davenport*, 142 S.Ct. at 1520 (citing *Davis v. Ayala*, 576

U.S. 257, 269 (2015); *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Early v. Packer*, 537 U.S. 3, 10–11 (2002) (per curiam)).  "When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable."  *Id.* at 1525 (citing *Cullen*, 563 U.S. at 181; *Fry*, 551 U.S., at 119).  And "[t]o accomplish that, a petitioner must persuade a federal court that no "fairminded juris[t]" could reach the state court's conclusion under [the Supreme Court's] precedents.  *Id.* (citing *Ayala*, 576 U.S., at 269 (internal quotation marks omitted)).

Here, to obtain relief on this claim, Petitioner would need to show that no fairminded jurist could reach the conclusion that the admission of Morgan–Glenn's opinion was harmless under *Chapman*.  Petitioner is unable to do so, and the Court denies relief on this claim.

In Ground Three of his Petition, Petitioner also argues that his rights under the Confrontation Clause were violated when the state presented Dr. Hua's testimony but failed to present Dr. Zaretski, who prepared the John's autopsy.  *See* ECF No. 1-1, Supporting Memorandum at 48-52.  Petitioner did not raise this argument on direct appeal.  On appeal from the denial of his third PCR petition, Petitioner argued in Point III that Dr. Hua's expert testimony contradicted the Zaretski autopsy report.  Ex. 19 at 43. He further argued that New Jersey evidence rules barred Hua testifying instead of Zaretski. Ex. 19 at 44–45.  And he argued that introducing Zaretski's report without producing him to testify violated the Confrontation Clause. Ex. 19 at 45–51.

The Appellate Division, in affirming the denial of Petitioner's third PCR petition stated the following: "Defendant's arguments in Point III regarding trial errors are procedurally barred

under Rule 3:22-5, as they were previously addressed in his direct appeal.[9] They are also barred

under Rule 3:22-4, as they could and should have been raised on direct appeal."  Ex. 22 at 6.

Petitioner's Confrontation Clause claim regarding the admission of Zaretski's autopsy

report through the testimony of Dr. Hua is procedurally defaulted.  As the United States Court of

Appeals for the Third Circuit explained in *Rolan v. Coleman*:

> Procedural default occurs when a claim has not been fairly
> presented to the state courts (i.e., is unexhausted) and there are no
> additional state remedies available to pursue, *see Wenger v. Frank*,
> 266 F.3d 218, 223-24 (3d Cir. 2001); or when an issue is properly
> asserted in the state system but not addressed on the merits because
> of an independent and adequate state procedural rule, see
> *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).

*Rolan*, 680 F.3d 311, 317 (3d Cir. 2012).  With respect to the latter type of procedural default,

federal courts are prohibited "from reviewing a state court decision involving a federal question

if the state court decision is based on a rule of state law that is independent of the federal

question and adequate to support the judgment."  *Bey v. Superintendent Greene SCI*, 856 F.3d

230, 236 (3d Cir. 2017) (quoting *Fahy v. Horn*, 516 F.3d 169, 187 (3d Cir. 2008)).  Procedural

default occurs when "a state court declined to address a prisoner's federal claims because the

prisoner had failed to meet a state procedural requirement." *Id.* (quoting *Coleman v. Thompson*,

501 U.S. 722, 730 (1991)).  The doctrine applies whether the default occurred at trial, on appeal,

or during collateral proceedings. *Edward v. Carpenter*, 529 U.S. 446, 451 (2000).  "For a federal

habeas claim to be barred by procedural default, however, the state rule must have been

announced prior to its application in the petitioner's case and must have been 'firmly established

and regularly followed.'" *Bey*, 856 F.3d at 236 (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24

---

[9] Petitioner did not previously raise the Confrontation Clause challenge to Dr. Hua's testimony in
his direct appeal.  As such, the Court does not consider Rule 3:22-5 as a basis for procedural
default and considers only Rule 3:22-4.

(1991)); *see also Lee v. Kemna*, 534 U.S. 362, 376 (2002) ("Ordinarily, violation of 'firmly established and regularly followed' state rules ... will be adequate to foreclose review of a federal claim."). Generally speaking, "[a] state court's refusal to address a prisoner's federal claims because he has not met a state procedural requirement is both independent and adequate." *Cabrera v. Barbo*, 175 F.3d 307, 312 (3d Cir.1999) (citations omitted). It is well settled that New Jersey Court Rule 3:22-4 provides an independent and adequate state ground to procedurally bar a petitioner's trial error claims where he could have raised those claims in a prior proceeding. *See Cabrera*, 175 F.3d at 314.

Federal habeas review is not available to a petitioner whose constitutional claims have not been addressed on the merits by the state courts due to procedural default. If a claim is procedurally defaulted, "the [habeas] court must then determine whether cause and prejudice existed for [the petitioner's] procedural default or whether failure to consider [the petitioner's claims] would 'result in a fundamental miscarriage of justice.'" *Carter v. Vaughn*, 62 F.3d 591, 595 (3d Cir. 1995) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Whether there is "cause" to excuse a procedural default "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Once a petitioner establishes cause, he must prove that prejudice resulted. *Id.* Prejudice is shown where the errors at trial "worked to [Petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (quoting *United States v. Frady*, 456 U.S. 152, 172 (1982), reh'g denied, 456 U.S. 1001 (1982)). The second basis to excuse procedural default, "miscarriage of justice," requires a petitioner to show new evidence of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 321 (1995).

The Court agrees with the state that Petitioner has not coherently addressed cause or prejudice with respect to this claim or shown new evidence of actual innocence. Moreover, Petitioner has not filed a reply brief. The Confrontation Clause claim with respect to the autopsy report is therefore subject to dismissal as procedurally defaulted.

Moreover, even if Petitioner's Confrontation Clause were not procedurally defaulted, Petitioner would not be entitled to habeas relief because there is no clearly established law from the United States Supreme Court addressing whether introduction of an autopsy report requires testimony from and the opportunity to cross examine the doctor who performed the autopsy. The "Supreme Court has not opined on whether an autopsy report qualifies as 'testimonial evidence' under the Confrontation Clause." *Green v. Kauffman*, No. 19-2919, 2020 WL 5039394, at *11 (E.D. Pa. Aug. 26, 2020); *Portes v. Capra*, 420 F. Supp. 3d 49, 55 (E.D.N.Y. 2018) ("The Supreme Court has not addressed ... the question of whether autopsy reports are ... testimonial statements."). Indeed, comments from the justices themselves in concurrences and dissents indicate that this question was not decisively resolved by *Crawford*, *Melendez-Diaz*, or other recent cases considering the Confrontation Clause. *See Williams v. Illinois*, 567 U.S. 50, 97–98 (2012) (Breyer, J., concurring) (noting risk of applying Confrontation Clause to autopsy reports); *Melendez- Diaz v. Massachusetts*, 557 U.S. 305, 335 (2009) (Kennedy, J., dissenting) (noting uncertain impact of new confrontation right and using as example danger of any application to autopsy reports).

At least two Circuit Courts of Appeal have upheld the denial of Confrontation Clause claims on that basis. *See Mitchell v. Kelly*, 520 F. App'x. 329, 331 (6th Cir. 2013) (upholding denial of a confrontation clause claim because "[n]o Supreme Court precedent clearly established that an autopsy report constitutes testimonial evidence"); *Nardi v. Pepe*, 662 F.3d 107, 111–12

(1st Cir. 2011) (upholding a denial because "an autopsy report can be distinguished from, or assimilated to, the sworn documents in" other Supreme Court cases, and finding that the "law has continued to evolve and no one can be certain just what the Supreme Court would say about that issue today").  Because there is no "clearly established Federal law, as determined by the Supreme Court of the United States," regarding whether and how the Confrontation Clause applies to autopsy reports, Petitioner cannot rely on the Confrontation Clause as a basis for habeas relief. 28 U.S.C. § 2254(d)(1).  For this reason, Petitioner is also not entitled to habeas relief on this issue.

### f.  Miranda Claim

Petitioner also raised a *Miranda*[10] claim in his direct appeal.  Although he did not include this claim as a ground for relief or provide any supporting arguments, he asks the Court to review it.  In Point I of his direct-appeal brief, petitioner argued that the trial judge should have suppressed petitioner's written statement based on alleged *Miranda* violations.  Petitioner made two arguments claiming the statement should have been suppressed.  He argued that the facts established that he was in custody when he gave a written statement to detectives at the police station. Ex. 4 at 21–25.  Petitioner also asserted that under New Jersey Supreme Court precedent, police did not provide him with enough information about the reasons for his interview to enable a voluntary waiver of rights.  Ex. 4 at 20–21, 25.

The Appellate Division rejected Petitioner's *Miranda* claims, finding that Petitioner's *Miranda* waiver was knowing and voluntary:

> Following the evidentiary hearing, Judge Heimlich ruled that defendant's statements were voluntary and admissible. He found the statement taken at the hospital was non-custodial, and part of a routine police investigation. Therefore, there was no

---

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

> reason to issue *Miranda* warnings at that time. The statement at the police station was taken during a custodial interview, as there was now information suggesting a homicide. However, Miranda warnings were issued and there was no evidence to suggest that the statement was involuntary. Defendant was calm and cooperative throughout, and the police were calm and pleasant. Defendant stated that he understood his rights, and he never indicated any desire to stop the interview.

*Merlain*, 2012 WL 986998, at *9. The Appellate likewise rejected Petitioner's argument that the length of time in custody amounted to coercion, explaining that "[t]he record reflects that defendant was at police headquarters for no more than three hours. He arrived some time between 5:00 and 5:30, and his interrogation was completed at 8:00 p.m. This is not an extreme length of time." *Id.* at *11. The Appellate Division also rejected Petitioner's argument that he was not given enough information about the reasons for the interrogation because Petitioner failed to raise it below and because he was given sufficient reason for the questioning, *see id. at *11*.

The Fifth Amendment's prohibition against compelled self-incrimination requires that *Miranda* warnings precede custodial interrogations. *See Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981). A parallel rule governing the admissibility of confessions in state courts arises from the Due Process Clause of the Fourteenth Amendment. *See Missouri v. Seibert*, 542 U.S. 600, 607 (2004).

A valid waiver of *Miranda* rights must be knowing, voluntary, and intelligent. *See Miranda*, 384 U.S. at 444. The inquiry into the validity of a waiver of *Miranda* rights "has two distinct dimensions." *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, (1986)). The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "must have been made with a full

awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 572 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, (1979)).

"[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984).  Here, the Appellate Division did not violate clearly established federal law in finding that Petitioner's three-hour interrogation did not affect the validity of his *Miranda* waiver.

Petitioner's argument that his *Miranda* waiver was involuntary because police did not tell him enough about what the subject matter of the questioning likewise provides no basis for relief under federal law.  In *Colorado v. Spring*, 479 U.S. at 573, the appellant claimed that the admission of his statement violated *Miranda* "because he signed the waiver form without being aware that he would be questioned about [a specific] homicide." *Id.*  The appellant further argued "that the failure to inform him of the potential subjects of interrogation constitute[d] the police trickery and deception condemned in *Miranda*, thus rendering his waiver of *Miranda* rights invalid. *Id.* at 575.  The Supreme Court resoundingly rejected this argument:

> This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today.

*Id.* at 576.  The Supreme Court held instead that "the failure of the law enforcement officials to inform [appellant] of the subject matter of the interrogation could not affect [his] decision to waive his Fifth Amendment privilege in a constitutionally significant manner." *Id.* at 859.

As noted by the state, the Appellate Division rejected Petitioner's argument that he was not given enough information about the reasons for the interrogation because Petitioner failed to

raise it below and because he was given sufficient reason for the questioning, *see Merlain*, 2012 WL 986998, at *11, but this claim also fails under *Spring*.[11]

    For these reasons, the Court denies relief on Petitioner's *Miranda* claims.

    **g.   Excessive Sentence Claim**

    Finally, Petitioner raised an excessive sentence claim on direct appeal.  Because Petitioner was sentenced within the range provided by state law and his arguments relate to the severity of the sentence imposed, his excessive sentence claim is not cognizable on habeas review.  *See Townsend v. Burke*, 334 U.S. 736, 741 (1948) (when a state "sentence [is] within the limits set by statute, its severity would not be grounds for [habeas] relief"); *Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40, 42-43 (3d Cir. 1984) (challenge to state court's sentencing discretion is not cognizable in federal habeas); *Hines v. Powell*, No. 19-19252, 2022 WL 2833831, at *4 (D.N.J. July 19, 2022) ("As Petitioner has not shown that his sentence was outside the range provided by state law, has not provided an independent constitutional violation which would permit a challenge to his sentence, and because the Appellate Division found that Petitioner's sentence comported with state law, Petitioner's excessive sentence claim fails to set forth a valid basis for habeas relief."); *Yorio v. New Jersey*, No. 10-5335, 2012 WL 3133948, at *3 (D.N.J. July 31, 2012) (excessive sentence claim not cognizable on habeas review where "the Appellate Division reviewed Petitioner's sentence and determined that he was properly sentenced, and that the sentence was not 'manifestly excessive or unduly punitive and does not constitute an abuse of discretion' "); *Smith v. Kerestes*, Civ. 08-0061, 2009 WL 1676136, at *16 (E.D. Pa. June 15, 2009) (rejecting petitioner's claim that his state sentence was

---

[11] Under New Jersey state law, the obligation of police is limited to informing an interrogatee if any warrant or criminal complaint has been filed, and, if so, what charges are pending. *See State v. Sims*, 271 A.3d 288, 302, recon. denied, 273 A.3d 947 (2022).

excessive because "absent a Constitutional violation, a federal court has no power to review a sentence in a habeas corpus proceeding unless it exceeds statutory limits"); *Logmans v. Moore*, No. 02-5622, 2005 WL 1106336, at *19 (D.N.J. Apr. 29, 2005) ("even if this Court was of the opinion that the sentence was excessive ... it is well established that the severity of the defendant's sentence alone constitutes no ground for [habeas] relief"). The Court therefore denies relief on this claim.

### h.  Certificate of Appealability

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district judge is required to determine whether a COA should issue. Having denied the claims in the Petition, the Court will also deny a COA. Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Miller-El v. Cockrell*, 537 U.S. 322 (2003). Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court will deny a COA.

## IV.  <u>CONCLUSION</u>

For the reasons explained in this Opinion, the Court denies the Petition and denies a COA. An appropriate Order follows.

_____
Hon. Madeline Cox Arleo
United States District Judge

Date: April 27, 2023.